Take your time setting up. I'll call the next case number 22-12966, Odette Blanco De Fernandez v. Seaboard Marine Ltd. Mr. Sokoloff, whenever you're ready. Thank you, Your Honor. May it please the court. My name is Eugene Sokoloff and I represent the appellants. In 1960, Fidel Castro's regime went after the Blanco Rizal family, taking their land and their exclusive rights to operate ports in Mariel Bay. Today, that land and those rights drive Seaboard's business in Cuba at the expense of the rightful claimants. The Helms-Burton Act was intended to redress exactly that kind of injury. The district court's summary judgment ruling cannot stand. The court failed to draw reasonable inferences in our favor from the evidence and it disregarded fundamental rules of contract interpretation. Can I ask you a question that goes to not the last issue about the representatives of the estates, but the two summary judgment questions dealing with Maritima and Azucarera? Yes, Your Honor. With regards to the covenant, what law are we supposed to apply in interpreting that document? You would think instinctively that it's Cuban law, but there's a dearth of Cuban law in the record and in the briefs. So then the other possibilities are some type of federal common law, because these are held in the Helms-Burton claims, or some default in terms of filling interstitial gaps to Florida law or some other law about contract interpretation, even though it's not technically a contract. It's a government grant of some kind of something. So what's the answer? This is indeed a puzzle, and it was raised below and litigated to the extent that we argued that a federal common law approach that was informed by state law was appropriate. Now, Seaboard argued initially that Cuban law was the better choice, but at the end of the day, they said that it would make no difference. And so what the district court did is it decided, I'm seeing that the parties just don't dispute that this makes no difference to the outcome, and so I'll forge ahead on essentially a federal common law basis. But what is the appropriate federal common law standard? I think that there are two ways to approach this. One is this is in the nature of a contract, even though it is a government grant. But the principles that we advance here for how it should be interpreted are also consistent with principles of statutory interpretation. And so I think that if the court took the view that although this is, in a sense, a public-private partnership, and in that sense it can be thought of as a contractual relationship, if the court felt that it made more sense to look at it as a statute because it is an official pronouncement, then our arguments on the merits would be consistent with that approach as well. All right. Thank you. Thank you, Your Honor. Seaboard does not defend the district court's mistakes. It doesn't argue that the court didn't draw the inferences that we were entitled to. It doesn't argue that the court properly interpreted the contract. Instead it attacks the district court's evidentiary rulings, and it raises a slew of alternative grounds for affirmance, many of which raise disputed questions of fact, others of which raise questions of first impression. None of them have merit, but they certainly shouldn't be addressed on this record. Well, Counsel Mike, I guess as I try to wrap my mind around this case, it seems to really turn to what land did your client own? And I'm not sure if that's really something that should rely on an inference as opposed to an exact finding that focuses on the actual boundaries. And it seems from the evidence, and as the district court found, that Ms. Fernandez does indeed own some land, which is why she had standing to overcome the motion to dismiss, but that there was no evidence as to the exact boundaries, and under this kind of claim, that that's critical and ended up being fatal to your client's claim. So, Judge Abudu, I want to push back a little bit on that because I think what the district court said is it acknowledged that there was evidence that the Blanco Rizal family, that my client, owned the land surrounding the terminal, and that is all that you need in order, as a factual basis, to draw the inferences that we're asking for in our brief. So that evidence was both the evidence that the court cited, which were the sort of sugar manuals that described the property holdings of the Belcinde family, from whom my client's family purchased the land, and also our expert's declaration, which explained where the footprint of the former naval airbase was that had taken some land away from the Belcinde family. That was not even the only evidence in the record, though. As we explained in our statement of material facts below, this is docket entry 198, there were a number of other pieces of evidence that supported that finding, or that could support that finding at trial. First, there was a Cuban Supreme Court decision that addressed the Belcinde family's claim, and again, we are the successors to their land rights, addressed their claim that they had not been compensated sufficiently for the taking for this airfield on which the terminal sits today. It described the land that was taken as coming from the Angosta estate. It said that there were seven caballerias taken, and it sought compensation. The court recites those facts, and the sugar manuals that the court pointed to, and a history of Marielle, explain that Angosta was a much larger property. There was a total of, I think, something like 78 caballerias, so only a small portion of them taken out, and I think the proper inference to draw there is what remains is the remainder of that property, all of which, it was undisputed, we acquired before the confiscation in the 1950s. At that point . . . Your contention is that the district court committed a couple of errors, maybe even more in your view, but that the district court erred in how it read, for example, on the claim involving the concession, that it misread the concession's breadth, and then, in addition, in your view, also erred in not looking at the record in the light most favorable to your client. And I think, Your Honor, you can . . . Right. There are two . . . those are . . . there are . . . they're overlapping circles to a degree, but they're different arguments, right? They're different arguments, and they don't overlap in the sense that you can reverse on either error and remand. They don't . . . they're not interdependent in the sense that you need to see that we . . . you need to determine that we win on both in order to reverse the summary judgment  I understand the argument from the briefs about the Rule 56 fight concerning the record. I understand that argument. I think I get both parties' positions, and I understand what the district court believed the record showed or didn't show. Tell me why you think the district court erred in construing and interpreting the concession. So if we want to go to the concession, I think that the principal mistake the district court made is it started with . . . well, let's not call it the concession first. Let's call it the concession decree. There was a document that contains the concession. That concession decree begins with a series of prefatory clauses, the whereas clauses. The district court's mistake was starting there and then reading everything that followed in the operative clauses in light of how it had interpreted the whereas clauses. Now it did that, although it found that the concession decree was unambiguous. So if it was unambiguous, there was no need to look at the whereas clauses. That's just basic black-letter contract law. And the error here was the . . . of course, we have very different views about what the whereas clauses mean. But what they don't mean is that the unambiguous language of the operative clauses can be narrowed. And in our view, there are sort of three basic pieces of evidence that we look at in the contract. There's text, context, and common sense. The text is the very first paragraph of the . . . once we get to the decretal part of the concession says, a concession is granted to exploit docks, warehouses, and other facilities in Mariel Bay, period. The only condition on that is it's subject to prior rights holders. So there's no limitation there, geographic or otherwise. The second is context, and that's the very next paragraph does something different. The next paragraph says that there's a finding of public necessity for the specific project that Maritima and Mariel had proposed. This is the building of a container terminal that was, of course, the first of its kind in that area, light years behind the terminal that exists today. That finding of public necessity was only about that project. It didn't purport to narrow the scope of the concession. And the way that we know that is if you go to the third part of the concession, it explains that one of the rights Maritima got was the right to come back and seek declarations of public necessity for further rights under the concession. So in our view, that is clearly an indication that there's a broad concession, it gives an exclusive right, there's a specific project . . . What is the exclusion from in the text? That's where I'm having trouble with. I see concession to do something. I'm not super familiar with, you know, pre-Castro Cuban law, but I mean, I get that the government is saying you can do something, but where does it say you can exclude others from doing a similar thing? So, Your Honor, this is . . . I don't want to run from the text because I think it fits directly with my common sense argument, but here are the indications in the text that I think support the common sense notion that it would have made no sense to strike this bargain unless it was exclusive. So one of those is the financing for building this terminal came from the government. The government issued bonds to fund the construction of the terminal. It would have made no sense for the government to issue bonds based on a predicted income stream from this terminal if somebody else could open up a terminal next door and draw all the revenues that the government was counting on to pay those bonds to another player. There are also . . . Why do you say that? I mean, I get the idea, but I mean, to make that common sense argument, you'd have to assume that there's all this money floating around ready to build a bunch of terminals on this bay when what the government is doing is saying, we're going to try to build a terminal. We're going to give you bonds to do it. I mean, the fact that the government is basically paying to build the terminal suggests to me that there's actually no one wanting to build a terminal here, and so it doesn't need to be exclusive. Your Honor, the concession is for 70 years, and so I think it's important that these rights were going to persist for a very long time. The investment was very substantial, and so you may be right that at the time there were no other takers. That's not in the record, and I don't know. But it doesn't make a difference for the purposes of the structure. I think it goes to the common sense proposition that concessions of this kind, concessions for the building of public necessities, generally are exclusive because you're asking a private actor to take a major business and financial risk, as the family and their business did here. And in exchange for that, you're granting them some right to depend on the income stream that that public work will generate. I want to touch back briefly on the land claim, because I want to make sure, Judge Jordan, you said you understood our arguments about the record, and I don't doubt that, but I want to just nail down one distinction. The court got almost all the way there. The court recognized that there was evidence that Ms. DeFernandez had a claim to this property. It recognized there was evidence that the property surrounded the terminal. The inference that it failed to draw was that Seaboard's commercial operations in Cuba depended on or otherwise benefited from that property. And they did that in two ways that we posit in our brief. One is that chicken is not still sitting at the end of the pier three years on. It had to go somewhere. And Seaboard contracted with local partners to move it off of the terminal over land from which the Blanco Rizal family would have had the right to exclude them. The other part is the court acknowledged that part of the terminal sat on confiscated property. And although the court thought it was very important that Seaboard's ships had not actually touched that part of the property, that was the wrong analysis. Because when we're talking about a complex facility of this kind, it simply makes no sense to subdivide it. You don't take an airport and say the control tower is one piece of property and the terminal is another, the runway is a third. It doesn't make sense to disaggregate it that way. And that's why in Seaboard's contracts with its Cuban partners, they defined the container terminal to include all of those facilities, including those that the court found there was evidence to sit on. Well, it might not make sense, but for someone who's seeking compensation for land that was the statute, right? That's right, Your Honor. And I think here what's critical is the section, the definition of trafficking that we are relying on for this claim. And I just want to read it because it is a little bit unusual, but I think it's very helpful. So it defines trafficking to include, and this is at 6023-9, engaging in a commercial activity using or otherwise benefiting from confiscated property. And it's clear, to me at least, I think it's clear that that does not require physical presence on the property. For example, if the control tower is on confiscated property and I land my plane on the runway, of course I'm benefiting from or using that property because my plane couldn't safely land without it. It's the exact same thing here. You have the container storage facilities, you have the railroads that take containers away from where the cranes lift them off the ships to their final destinations. The facility doesn't make sense if you try to atomize it. But I thought that there was an exception in the act, and maybe I'm misreading it, that accounts for necessary travel. So if Seaboard is going to use or land its planes or whatever in an area that's not owned by the family and the only way it can get there is through land that arguably is owned, doesn't that satisfy or fit within the exception? Not at all. So before you get to necessary, you have to get to lawful travel. And that they cannot do. Because lawful travel, and I'll say that this is the classic example of a question where you would not want to approach it without a reasoned decision from the district court because it is a question of first impression and it is complex. But what's not complex is that the regulations that Congress codified when it enacted Title III. So it was very well aware of what it was codifying. Make a distinction between travel, which relates to people, and import and export, which relates to things. We read the regulations that they cited, that they said made their travel lawful. Every single time the word travel or any of its related words appears, it's talking about people. Even when it's talking about people bringing things, their personal effects, it refers to individuals traveling and the re-export or export of their personal effects. So there's a distinction that the regulations draw and that the statute honed in on between export and import, which is the kind of commercial activity Seaboard is doing here, and travel, which is the kind of limited travel the regulations sometimes authorize for, academic visits or other things like that. So they can't get to lawful. And so we don't need to worry about necessary. But at the very least, I would say on this record and on the threadbare briefing on this that you wouldn't necessarily want to reach that ground, but if you wanted to, I think the text of the regulation is clear. All right. Thank you very much. Thank you, Your Honor. Mr. Peterson. Thank you. May it please the Court. William Peterson on behalf of the Appalee Seaboard Marine Limited. The district court was right. At summary judgment, plaintiffs simply failed to present evidence supporting their claims, and this court can affirm based on the district court's reasoning. But as we raised in the brief, this appeal also involves novel and important issues on which district courts and litigants would benefit from this court's guidance regarding the scope of the private right of action under the Helms-Burton Act. And I'd like to start with one of those, which is the undisputed fact that these plaintiffs here did not own the property on which they are seeking to press claims. Congress legislates against background principles of law. Those background principles include the very well-established rule that shareholders and corporations are distinct legal entities, and that a corporation, when a corporation suffers an injury, is the proper plaintiff, and a shareholder is not. But doesn't the Act talk about claimant as someone who has an interest in? So, the Act refers to... I mean, this is not common law stuff. This is statutory, and the Act doesn't refer to a person or entity that owns. It talks about a claimant and then defines a claimant, or at least speaks about a claimant. It doesn't quite define it, but this court in Glynn v. Club Med explained exactly what Congress meant by that, and it said, Congress used the phrase ownership of a claim to such property to refer, quote, to the property interest that former owners of confiscated property now have, and it explained why. Because it said, the Helms-Burton Act renders these confiscations wrongful, but not ineffectual. So the Cuban government is the owner. Congress couldn't have said owner. Congress replaced that ownership right with the ownership of a claim. Here the former owners were the corporations. Who has the ownership of a claim to the property? The corporations. Now my friend says, well, it's okay. The commission has certified claims based on shareholders. Two responses to that. First, you have to look at what the commission is certifying. When the commission certifies shareholder claims, what it's frequently doing is certifying the value of what was confiscated from the shareholder. That is, the shareholder owned securities, and it's certifying the value of a claim based on the ownership interest in the corporation. Now here, we haven't been accused of trafficking in any securities or ownership interest in Azucarera or Maritima. But the other thing is, Congress specifically spoke to this issue in the International Claims Settlement Act. Section 505 of that act, it's 22 U.S.C. 1643d, which for claims in front of the commission actually creates a limited and specific right to veil piercing. The fact that Congress did specifically, and in narrow and limited circumstances, allow shareholders to assert claims in front of the commission, or bring claims to the commission, but that Congress didn't do so in the Helms-Burton Act, is a strong, we think, conclusive indication that Congress intended the ordinary rules to apply. Go ahead, go ahead. So on the shareholder issue, let's just say I tend to agree with you on the shareholder issue. The confiscation decree here, though, specifically mentions the person, right? So it says it's confiscating property from, I forget the name at the time, but individuals. What do we do about that? Well, I think you take my friend at his word in his opening brief, where he said the property that we're talking about, that we're allegedly trafficking in, was confiscated from these corporations. He said this concession was confiscated from Maritima Mariel, the land was confiscated from Azucarera Mariel. Right, but I guess the issue I'm having, like I said, and I think I could probably speak for all of us when I say this, that we don't know a lot about pre-Castro Cuban law. Given that the confiscation decree is directed towards individuals, maybe there just wasn't a concept of separate corporate forms and derivative ownership and things like that at the time, and so that's why the confiscation decree mentions these individuals and not just the corporation. Well, I certainly think when you look at the, so first I'll say that's an argument my friend has never made, that Cuba doesn't respect the corporate form that way. Well, you know, I mean, I guess I'll say maybe that's one way to read into what this confiscation decree is doing. Well, I think there's no question, though, that these individuals, again, not Ms. Fernandez, but her siblings, had ownership interests in these companies. So obviously, of course, something was being confiscated from them. Their shares, their securities in the companies are being confiscated. But they're the shareholders, they own the companies, the companies are the ones that actually own the property we're allegedly trafficked in. I don't think you can get from the confiscation decree to an inference that particular issue is relevant. Have you had something akin to a United States partnership? Could a partner sue? I think that's a difficult question. I think, I suspect under partnership it is possible. I know personally if it were a partnership that existed. Who's partnership law? I haven't looked into it for partnership purposes, Your Honor. That's a problem for everybody. I think, I'm trying to think. Because if you're talking about the corporate form, sort of the same question I asked Mr. Sokoloff in the beginning on a different issue, but like whose corporate form are we looking at? Do we have to figure out what Cuban law allowed or provided or permitted in 1959, 1960 to see what rights shareholders had independent of the corporation? And so, for example, what's the answer if Cuban law said at the time, a shareholder can sue on behalf of his corporation in a derivative way without any sort of the preconditions that American law now requires generally? Then what's the answer? If it's a derivative suit on behalf of the corporation, then I would say that because the corporation is not a United States national, it wouldn't be able to go forward. We have a definition of United States national in the Helms-Burton Act. Congress recognized that some legal entities like corporations will constitute United States nationals. Some other legal entities will not. So, to the extent a partnership is a U.S. national for these purposes, it would be able to bring suit in its own name. That doesn't mean the individual partners would be able to. But let me turn to the individual trafficking acts at issue, unless the court has other questions on the shareholder point. I guess the only other point I'd make is that this sort of broad right to bring claims, not only would actually create tension with the limited veil piercing that Congress created in the International Claims Settlement Act. Again, I'd encourage you to look at it. Why is it appropriate? It's one thing, and we do it all the time, when you look at subsections within a statute or within the same act where Congress does one thing here, does something else here, and the inference is if it knew what it was doing in D and didn't do it in A, then that's a really good indication of what A really means. But that sort of shift doesn't really work when you're talking across different acts, right? Well, I think that's right. There's a different inference to be drawn in those circumstances, a more limited inference. Well, I think that's right. But I think it was my friend's suggestion who said that the fact that the commission has certified shareholder claims somehow justifies doing the same thing. I know, but he may be wrong on that, too. So, let me turn briefly to the definition of trafficking acts. My friend read the definition of trafficking, but remarkably, he left out the critical phrase knowingly and intentionally engages in commercial activity using or otherwise benefiting from confiscated property. When we look at trafficking, of course, that knowing and intentionally doesn't just require a person to knowingly and intentionally engage in a commercial activity. That would effectively make this a strict liability statute. The Supreme Court has told us that when you apply knowingly and intentionally to verbs, you apply it to the entire object of those verbs. So, here, to be liable for trafficking, the defendant had to know and intend to engage in commercial activity that used or benefited from confiscated property. You want us to rule on that basis? The district court didn't rule on that ground. The district court didn't, but, Your Honor, I will tell you, part of the arguments I'm making here today are to try to give some guidance on the statute. There is a reason that this court is not seeing trial judgments coming up on the Helmsburg Act. The sorts of damages that people are coming up with are staggering numbers. At one point here, it was a suggestion of $5 billion before troubling, and the suggestion at trial, I appreciate my friend abandoning it on appeal, was that every error could receive that. There are not many companies that could be willing to roll the dice and go to trial at the risk of a $15 billion judgment against them. It is critical that this court provide some guidance on the meaning of the statute, and there's frankly no good faith argument to the contrary that knowingly and You're not going to get any guidance on whether or not the damages permitted under the act are impermissibly confiscatory or violate some constitutional principle until you get a judgment on the merits adverse to one of these companies. That's right, but clarifying the liability, and in particular holding that knowingly and intentionally apply to confiscated property does a great deal of good for defendants in this situation to make clear that it is not simply a strict liability statute. So let me turn to the Trafficking Acts at issue as briefly as I can. Was Seaboard placed on notice of these claims at any point during the alleged violations? It received a letter from the plaintiffs that said we own something somewhere in the Bay of Mariel. It didn't tell us we own this property. It didn't tell us we own this sort of 70-year monopoly right over all ports in the Bay of Mariel. They certainly didn't give us notice of that. In response, we performed an investigation. We said, look, everyone agrees this container terminal we're making these deliveries to was built on a naval air station that was not confiscated property. And in fact, we have a district judge here finding that after discovery, after marshaling all of their evidence, the plaintiffs don't actually have evidence that they own these rights they claim we trafficked in. It would be inconsistent with that decision to say not only did you do so, but you did so knowingly and intentionally trafficked in those confiscated properties. So let's start with the concession. And I think the key here is looking at the operative provisions. Part 1A allows Maritima Mariel to construct a maritime terminal. Part 1B gives Maritima Mariel the rights for draining and dredging of construction for said project for a maritime terminal. And guess what Maritima Mariel did after receiving these rights? It actually dredged and actually built a maritime terminal by the town of Mariel on the east side of the bay. Continuing, you see everything in this concession is tied to the project to build a maritime terminal. Part 2. Look at Part 3, for example. My friend suggests that Part 3 somehow indicates that this grants them a 70-year monopoly, and there's no textual basis for that in this document. But Part 3 says, within five years, tell us what works you intend to build. And if you don't, you're going to forfeit anything that you don't tell us about in those five years. That's inconsistent with this 70-year monopoly they're arguing for. And now the whereas clauses are perfectly consistent with these operative provisions. It makes clear that Maritima Mariel made a construction application in its property and in the adjacent zone. Keep in mind, Maritima Mariel never owned property on the west side of the bay. All of its property interests were on the east side of the bay by the town of Mariel in the 1934 concession. My friend talked about the National Financing Agency. We have a report of the National Financing Agency in the record. It's Documentary 181-9. That report of the National Financing Agency doesn't breathe one word about this 70-year monopoly they claim. It says that Maritima Mariel is seeking to construct the maritime terminal. He talked about the value of the concession. This was not an argument that they made to the district court. He cites page 16 of Documentary 197. You'll see that's not an argument that the concession is valueless unless it includes the 70-year monopoly over the bay. Where does the 70-year period come from, in your view? The concession itself says that the rights are for 70 years. What does that 70-year period mean? It's referring to Maritima Mariel's rights over the maritime terminal that it constructs. There is a concession for 70 years. You just think it's more limited. Yes, certainly, Your Honor. I'm not saying it's it. But there's a very large difference between a 70-year concession related to a maritime terminal on the east side of the bay, which is what they built and what rights they received, and this 70-year monopoly over all concessions in the entire bay, which is inconsistent with the actual facts. There were five existing concessions in the bay at the time this concession was granted. Just three years later, the Cuban government granted another concession to another party to build another dock in the bay. My friend's argument, there's this 70-year, we are the only ones who are allowed to do this in the bay. The first mention of that you will find anywhere is in the complaint in this case. It is not supported by any of the Cuban records. It's not supported by any contemporaneous understanding. And again, even if you can find that Seaboard did somehow use or benefit from this concession, which is very hard to say that making deliveries to a dock benefits from this intangible monopoly property right they suggest, the fact is there's no evidence that Seaboard knew or intended to traffic in the concession. Can I ask you to turn to the third issue in the case, and that is the personal representatives of the estates? Yes, Your Honor. Were applying Florida law, I presume, because of default? We look at it as a question of U.S. law. Informed by what, given that there's no survivorship or probate law in the United States as a matter of federal statutory law. We look at Garcia Bengucia, that the heirs acquire upon the death of the decedent. But a personal representative is not an heir. Your Honor, but we believe it would be inconsistent with the 1996 deadline that Congress set forth for the estates to be reopened long after death for these claims to be asserted by representatives of the estates. I mean, this is only my view, but the statute doesn't make sense in all of its respects. And it may not make sense here, but an estate is a different entity, legal entity. It's created as a matter of law for administration by a state, and it is not the heir. And Florida law, for example, is very clear that a personal representative only holds  until that property is obtained, cataloged, valued and then distributed. So I'm not sure that a personal representative is the same thing as an heir under Florida law or any other law. We're not suggesting they're the same thing as an heir, but what we are suggesting is it would render the prohibition on heirs asserting these claims meaningless if they could just be asserted through personal representatives. So look here, Alfredo, for example, died in 2006. They petitioned to reopen his estate to assert this claim in 2020. Byron died in 2001. They petitioned to reopen his estate to assert this claim 19 years later. It's essentially a recipe to say no one ever acquires it, heirs don't acquire it, that unless there's some specific and magical act under state probate law, you are always free decades after the fact to reopen these estates and get around the 1996 acquisition deadline that Congress put in the statute. Of course. I don't want you to sit down without getting to this, so let's just assume the district court did everything right until it got to the point where it said that there was no trafficking. Well, you don't have to assume the district court was wrong about this, but just was the district court wrong in saying this little sliver of land that was used to create the terminal because it wasn't used to actually store the containers means that there was no trafficking with respect to your client's use of the terminal. So, Your Honor, the district court was right, but let me start with the predicate, which is my friend says the district court says that we owned everything surrounding the Naval Air Station. That's not what the district court found. I'd encourage you to look at pages 24 and 25 of the opinion. It just says some land holdings in the area surrounding the Naval Air Station. Now, my friend says, well, we are the heirs of the Balsende family. Everything the Balsende family had, we have. That is not supported by the record. They had a cartography expert come in. This is what we filed the 28 J letters on. Their cartography expert charted land. He did not offer the opinion that everything owned by the Balsende family was now owned by the Blanco Rossell family. He simply said, I was told by counsel to make that assumption. You see that both in his original report, clarified in the supplemental report. They never presented evidence confirming that assumption. And I'll point you, it's refuted by the evidence in the record. Documentary 181-1, exhibit B, page 12, that's at the Diaz expert report, talks about a judgment about land in the Angosta Peninsula that was received by Gustavo Balsende in 1959 after, my friends say, they acquired everything the Balsende family owned. So that's problem one with these claims. Problem two is, what they can't do is show how or in what way Seaboard actually benefited from any sliver of land on which the container terminal might have overlapped with something they hypothetically owned. Wasn't it able to offload containers there? Onto that sliver of land that they allegedly owned? No, that sliver of land was used for the offloading operation. No, Your Honor, there's no evidence of that. What they have not done is shown is that there's any evidence of anything that actually occurred on this land. They've tried to come forward on appeal. Your Honor, we don't know what's there. This is their burden of proof. They need to show we benefited from this confiscated property. They're hypothetical, you may be right that there's not specific evidence about this, but their hypothetical is, this is like an airport. The fact that you might not go to Terminal D, you go to Terminal E instead doesn't mean that you're not using the airport as a whole. The fact that there's some land that was used to make another terminal, it's an airport as a whole. You're using this shipping terminal as a whole. What do you say about that? I think what they would need to show is that our commercial activities somehow benefited from things that were done on that confiscated land. If they want to say that's the land where an air traffic control center rests, they just didn't prove it. They didn't come in with evidence to show this is land that we owned, this is what was done on that land, and this is how you benefited from it. They're just relying on inferences piled upon inferences. When you look, for example, at the TCM office, my friend is going to, I suspect, stand up and tell you what we showed the TCM office was on that land. First, they didn't show anything happening at a TCM office. There's no evidence of anything that was done there. This is not a motion to dismiss. This is summary judgment. They had the opportunity to take discovery and ask questions. They didn't show that. But second, the arguments they're making to you in their brief are exactly the same arguments that they tried to make with an untimely expert declaration that the district court struck as harmful and prejudicial. The district court said, these arguments about the maps you're bringing up too late in the day, you cannot make them with your expert, and the district court struck that declaration, that's document 256, pages 6-9, as harmful. So they didn't have evidence before the district court and they don't have evidence before this court that the TCM office was located on confiscated land. With respect to Taina's use of the confiscated land, their theory is, I think, that the dock is somehow landlocked and you have to travel across confiscated property to go anywhere else. Again, they just don't have evidence of that. That requires this assumption that they owned everything surrounding the Naval Air Station. The district court didn't find that. And again, their cartography expert didn't say, that's my testimony. Their map expert came in and said, council told me to assume it, I'm making that assumption, and if that's true, here's what they own. But he certainly didn't offer that opinion themselves. Fundamentally, the district court was right. This is just a failure of proof case. They didn't come in with the evidence they needed to prove their claims. They didn't come in with the evidence they needed to show that Seaboard used or otherwise benefited from confiscated property, much less that Seaboard knew and intended that there was confiscated property involved in its commercial activities. What do you say to council's interpretation of the exception in the statute that allows for travel over confiscated land that's necessary to get to unconfiscated land? If I understand it correctly, the distinction being made that necessary travel really relates to people as opposed to goods and other commodities. Much like the way that Congress used a narrowing clarification on the word acquire when it meant it, as this court held in Garcia-Vengochia, Congress used a narrowing clarification on travel when it meant travel by individuals. Look for example at 22 U.S.C. 6042-2. When Congress referred to travel by individuals, it was using the word in a narrow sense. There's no suggestion here that Congress meant to rely on some sort of regulatory definition of travel when it was creating the lawful travel exception. And I'll note in fact the regulations themselves, 31 CFR 515.572A4, do make a reference to vessels traveling to Cuba. And we point out, it's undisputed at least on appeal, that what we did was lawful. Congress said, you are allowed, we've relaxed the embargo, you're allowed to make these deliveries of frozen chickens, you're allowed to make these deliveries of gift parcels to Cuba. It's undisputed that it was necessary for our vessels to travel to this port, this container terminal, to drop off the containers where these frozen chickens and deliveries were made. And the suggestion that we owe billions of dollars to every member of the Blanca Rossell family for doing precisely what Congress allowed us to do is inconsistent with the lawful travel exception that Congress wrote into the statute. All right, thank you very much, Mr. Peterson. Thank you. Your Honors, I'd like to reach the sort of record questions that my friend just raised, but I want to just very briefly start with three high-level points. One, I think the standing argument is foreclosed by the court's decision in Garcia Bengochea. Two, their 30B6 witness admitted that the trafficking continued after we filed our complaint in this case, which was extraordinarily detailed about the rights we claimed were violated. And three, I think that the fact that the discussion of the concession relies, for my friend, relies on the same provisions that I mentioned and then goes very quickly to parole evidence just reinforces our view that this should have been decided by a jury. To my point about corporate standing, in this court's decision in Garcia Bengochea, the court said that there was Article III standing for a plaintiff who asserted a claim that was exactly like this one. The claim was to a corporation in which that individual's family held shares. The corporation operated a maritime terminal and the Cuban government confiscated the corporation. The lead argument, one of the three questions presented in the defendant's brief to this court in that case was, this is a corporation, only the corporation has the right to assert these claims. This court did not even mention that argument. And it's not just because there's a distinction between Article III standing and prudential standing. Just look at the way the court described the injury in Garcia Bengochea. The court said that the plaintiff is suing based on his alleged personal interest in or at least claim to property. That's at 57F 4th 923. As someone with a claimed interest in this company, he was shut out wrongfully from the gains produced by exploiting the property that is rightfully his. And it explained that the injury was the use of that business without the permission of or payment to the plaintiff, not the corporation. And there's a good reason for that. There are no corporations. The corporations were expropriated at the same time as all of their property. And Judge Brasher, to your point, put our cases, if anything, even stronger. Because this expropriation came at the conclusion of a sort of kangaroo court that accused the Blanco Rizal family of all kinds of counter-revolutionary activity. And the upshot of that was, we are taking all of the family's businesses as well as all the rights attendant to those businesses. So I think it only makes sense, and I think it would be inconsistent with the court's decision in Garcia Bengochea to say now that, well, the nature of the injury is really to this nonexistent corporation. Judge King, in the district court decision in that case, I think said it very well. There's no indication in the text or structure that limits claims in this way. And if anything, the use of the word claim to property suggests that it's broader than a simple ownership interest. I take my friend on the other side to say, well, they couldn't say that they owned the property because they don't own the property anymore. That's fine. Congress could have said formerly owned or former owners. It talked about a claim to property and confiscation of shares, and the commission valued those shares based on the corporate property. Obviously nobody traffics in shares, so Congress understood that the trafficking would be in the underlying property. On Sienta, obviously trafficking after you get the complaint, I can't imagine a way that that's not knowing and intentional. To get to the land claim and some of what my friend said about that. For starters, 268 page 25, the court says, Plaintiff has provided evidence of her ownership claim to the area surrounding the Naval Air Station. I think that's pretty clear, that's what we said in our brief, and that was a direct quote from the district court. My friend focused on the expert report, but I think you'll notice that in my presentation I didn't talk much about the expert report because what I was focused on was the record evidence supporting the assumptions that the expert got from counsel. Those assumptions were limited to the fact that the land where the airbase sat was expropriated from the Belcinde family, that the remaining land belonged to the Belcinde family, and that that land was then transferred to my client's family. Every one of those propositions is supported in the record. I mentioned our statement of material facts, but just to point you to some of the docket entries where these things appear. 181-2, which was included as an attachment to their expert's report, is the Cuban Supreme Court decision that discusses the initial expropriation. It describes this as being 7 acres out of a larger estate taken for the airbase. The history of Mariel that we cited and the district court cited, 198-7, explains that that farm was absorbed into Central San Ramon. That was the sugar company that the Blanco Rizal family acquired. There's no actual dispute about that, but it's also well documented at documents 198-9, 198-10. This is not a case where there was a failure of evidence. This is a case where the district court properly recognized there was evidence and then failed to draw the reasonable inference. Thank you, Mr. Peterson.